IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs March 28, 2012

## KENNETH BARTLEY v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Campbell County**
**No. 14746    Jon Kerry Blackwood, Judge**

---

**No. E2011-01603-CCA-R3-PC - Filed March 11, 2013**

---

The State appeals the post-conviction court's grant of relief to the Petitioner, Kenneth Bartley, contending that (1) the court erred in admitting the affidavit of Dr. James Murray; (2) the Petitioner failed to establish that trial counsel provided ineffective assistance; and (3) the Petitioner is entitled to no relief on his previously determined claim that his guilty plea was not knowingly, intelligently, and voluntarily entered.  Upon review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and THOMAS T. WOODALL, J., joined.

Robert E. Cooper, Jr., Attorney General and Reporter; John H. Bledsoe, Senior Counsel; William Paul Phillips, District Attorney General; Michael O. Ripley and Scarlett W. Ellis, Assistant District Attorneys General, for the Appellant, State of Tennessee.

Gregory P. Isaacs and Andrea B. Mohr, Knoxville, Tennessee, for the Petitioner-Appellee, Kenneth Bartley.

**OPINION**

This case concerns the November 8, 2005 shooting at the Campbell County High School, in which one victim, Ken Bruce, died and two victims, Gary Seale and Jimmy Charles Pierce, were injured.  The Petitioner, who was fourteen years old at the time of the shooting, was arrested.  Following his charge in juvenile court, his waiver of a transfer hearing, his indictment in criminal court, his remand to juvenile court for a transfer hearing, and his transfer from juvenile court to criminal court, the Petitioner was indicted by the Campbell County Grand Jury for one count of first degree premeditated murder, one count

of first degree felony murder, two counts of attempted first degree murder, one count of carrying a firearm in a public school, one count of possession of a Schedule IV controlled substance with intent to sell, and one count of possession of a Schedule IV controlled substance with intent to deliver.

**Trial and Entry of Guilty Plea.** On April 10, 2007, the Petitioner's case proceeded to trial. Prior to the jury being sworn, the State informed the trial court that it had a matter that needed to be discussed outside the presence of the jury and requested that the parties meet with the trial court in chambers. Once in chambers, trial counsel waived the Petitioner's presence at the meeting. The State then informed the court that before jury selection began that morning, it made a counter-offer to the Petitioner, which he declined. The Petitioner, through counsel, made the State an offer, which it declined. Then the State made the Petitioner a counter-offer, which he accepted. The accepted offer was that the Petitioner would plead guilty to one count of second degree murder and two counts of attempted second degree murder in exchange for consecutive sentences of twenty-five years at one hundred percent release eligibility and two sentences of ten years at twenty percent release eligibility, for an effective sentence of forty-five years. As a part of the plea agreement, the Petitioner's remaining charges would be dismissed.

Upon hearing the terms of the plea agreement, the trial court invited the victims and the family of the deceased victim into chambers. Trial counsel announced that if the victims were going to meet in chambers then the Petitioner should join the meeting in chambers. The surviving victims, the deceased victim's family, and the Petitioner entered the court's chambers. The court explained the terms of the plea agreement to the victims and the deceased victim's family, who all stated that they believed the State was representing their best interests. At that point, the victims, victim's family, and the Petitioner exited chambers. The court instructed the attorneys to draft the plea agreement.

In open court, the State announced that the State and the Petitioner had agreed to the aforementioned plea agreement, and the Petitioner was sworn. The Petitioner testified that he was fifteen years old and was in the ninth grade. He acknowledged that he was charged with first degree murder and that he was facing a sentence of life imprisonment. He also acknowledged that he was charged with two counts of attempted first degree murder and was facing a sentence between twenty-five and sixty years for these counts. The Petitioner further acknowledged his other charges and the sentences he was facing for each of those charges. The Petitioner said he understood that he had a right to plead not guilty to his charges and that he would be entitled to a jury trial. He acknowledged all of his rights associated with a jury trial. He also acknowledged that if his case had been submitted to a jury, the court would have instructed the jury on the lesser included offenses of first degree murder, including second degree murder, voluntary manslaughter, reckless homicide, and

criminal negligent homicide, which carried lesser sentences than first degree murder. Then the following exchange occurred between the trial court and the Petitioner:

The Court: Having explained all those rights to you, do you now hereby voluntarily waive or give up your right to a jury trial?

[The Petitioner]: Yes, sir.

The Court: Do you understand that by giving up your jury trial rights you are also giving up your right to an appeal of these convictions–do you understand that?

[The Petitioner]: Yes, sir.

. . . .

The Court: Do you understand that by your plea of guilty, that that is the strong evidence against you?

[The Petitioner]: Yes, sir.

The Court: Do you understand that by your plea of guilty to these offenses that you are stipulating that there would be a factual basis to support these convictions if this case proceeded to trial?

[The Petitioner]: Yes, sir.

The Petitioner said that he understood the terms of his plea agreement and the sentences that he would receive under the plea agreement. He also acknowledged that he might not be granted parole after serving twenty percent of the two ten-year sentences. He then entered guilty pleas to one count of second degree murder and two counts of attempted second degree murder, which were accepted by the trial court. The trial court then sentenced him to consecutive sentences of twenty-five years at one hundred percent for the second degree murder conviction and two ten-year sentences at twenty percent for the attempted second degree murder convictions, for an effective sentence of forty-five years.

**Motion to Withdraw Guilty Plea.** On May 8, 2007, the Petitioner, with the assistance of trial counsel, filed a motion to withdraw his guilty plea, alleging (1) his plea

-3-

was entered without a recitation of facts that would justify a finding of guilt, and (2) his plea was entered without the consent of his parents and his mother did not agree with the plea.

On June 26, 2007, the Petitioner, through new counsel, filed an amended motion to withdraw his guilty plea, additionally claiming that his plea was not knowing and voluntary because (1) he was not informed of the relevant lesser included offenses and sentences for the charged offenses; (2) he was "only fifteen years old at the time and was deprived of the opportunity to meet with and consult with his parents regarding the plea offer" (3) he was pressured by trial counsel to accept the offer and was not given the opportunity to discuss the last-minute offer with any other individuals, especially his parents; and (4) "given the status of his case and defense theory, and being [that] he was of 'tender years' at age fifteen, he was compelled to follow his counsel's recommendation [that] he accept the guilty plea and sentences rendered in this case."

On July 2, 2007, after conducting an evidentiary hearing on the motions to withdraw the guilty plea, the trial court denied the motions. The Petitioner appealed, claiming that there were no facts presented that supported his guilty plea and that his plea was not knowing and voluntary. See State v. Kenneth S. Bartley, No. E2007-01649-CCA-R3-CD, 2009 WL 1175148, at *1 (Tenn. Crim. App. May 1, 2009), perm. app. denied (Tenn. Oct. 19, 2009). On appeal, this court affirmed the trial court's denial of the motions to withdraw the plea, concluding that the Petitioner's plea was knowing and voluntary and that the trial court's finding that the Petitioner understood the factual basis of his guilty plea was supported by the record. See id. at *6-8.

**Post-Conviction Petition.** On October 18, 2010, the Petitioner, through a third attorney, filed a timely petition for post-conviction relief, claiming that his guilty plea was not knowing and voluntary and that trial counsel provided ineffective assistance. Specifically, the Petitioner argued that his guilty plea was not knowing, voluntary, or intelligent because: (1) in light of his age and history of psychological problems, he "lacked the capacity to sufficiently understand the proceedings and the full consequences of accepting the State's plea offer"; (2) he had a meritorious defense to the charges of first degree premeditated murder and first degree felony murder, of which trial counsel did not inform him; and (3) the trial court failed to inquire during the plea colloquy whether his plea was voluntary and not the result of force, threats, or promises as required by Rule 11 of the Tennessee Rules of Criminal Procedure and State v. Mackey, 553 S.W.2d 337 (Tenn. 1977), superseded on other grounds by rule as stated in State v. Wilson, 31 S.W.3d 189, 193 (Tenn. 2000). The Petitioner also specifically argued that trial counsel provided ineffective assistance of counsel by: (1) failing to timely communicate the State's initial plea offer and the Petitioner's acceptance of it and to petition the court for the enforcement of the initial agreement after learning that it had been withdrawn by the State; (2) failing to conduct a

reasonable investigation of his case prior to trial and failing to interview, prepare, or subpoena necessary fact and expert witnesses; (3) failing to file a motion to suppress his recorded statement and failing to file a motion for a change of venue; (4) failing to communicate to his parents the State's offer at trial and failing to include his parents in the his decision regarding whether to accept or reject the offer; (5) failing to move for a continuance so that he would have additional time to consider the State's offer; and (6) failing to raise the issue of his diminished capacity at the time he committed the offenses.

On November 23, 2010, the State responded to the petition, asserting that the Petitioner's claim that his guilty plea was not knowing, voluntary, or intelligent was waived, or, alternatively, that this claim had been previously determined under Tennessee Code Annotated section 40-30-106. The same day, the State filed a motion to dismiss the post-conviction petition.

At the June 2, 2011 post-conviction hearing, Rita Broyles the Petitioner's mother, testified that after the shooting, she retained trial counsel and Dr. Diana McCoy, a psychologist. Dr. McCoy met with her son frequently while he was incarcerated at the Knox County Detention Center and twice a month while he was incarcerated at Mountain View Development Center. Early in the case, Broyles said trial counsel informed her and the Petitioner's father that he had received an offer, contingent on the Petitioner waiving his transfer hearing, of "15 years for manslaughter, two ten years for assault [which] would be concurrent [with the] 15 years, and that [the Petitioner] at eight years could be up for parole and . . . if he . . . did well, did not get in trouble, anything like that, that he would be up for parole." Trial counsel encouraged Broyles and the Petitioner's father to talk about the offer with the Petitioner as a family. The Petitioner subsequently told trial counsel that he wanted to accept that offer, and he waived his transfer hearing. Once the Petitioner accepted the first plea agreement, he was moved from the Knox County Detention Center to Mountain View Development Center on March 30, 2006. She said that trial counsel never talked to her about when her son would enter his guilty plea regarding the fifteen-year plea agreement.

Broyles said that in September or October of 2006, trial counsel informed her that "there was no longer an agreement because the deceased victim's widow had not agreed to that plea agreement." She said that her son was "naturally upset, sad" when he discovered that the plea agreement had been rescinded.

Broyles stated that after the transfer hearing, her son was sent to criminal court to be tried as an adult. At the end of March 2007, she and the Petitioner's father visited the Petitioner at Mountain View Development Center and encountered trial counsel, who was visiting him as well. During that visit, trial counsel told them that he had received another offer for a total of forty-five years, consisting of a twenty-five year sentence at one hundred

percent and two ten-year sentences at thirty percent, which the Petitioner quickly rejected after discussing it with his family and trial counsel. Broyles said she agreed that her son should reject the offer, especially because his trial date was so near.

Broyles said that on her son's trial date on April 10, 2007, the courtroom was "packed" with "people standing against the walls . . . a lot of cameras, reporters" and that every juror had heard about her son's case. She said that a tentative jury had been selected prior to lunch.

After lunch, Broyles returned to the courtroom, which was still crowded. She said that trial counsel, the prosecutor, and the trial court went into chambers to talk, which lasted a long time, and the Petitioner remained in the courtroom. Then the Petitioner and the victims and deceased victim's family went into chambers and met for a lengthy period of time. At that point, Broyles said she was unaware that the prosecution had made an offer to her son. She said that trial counsel never informed her as to the reason for the meetings and that she believed that she would also be summoned into chambers. Broyles saw everyone exit the chambers and take their seats. Then trial counsel motioned to Broyles and the Petitioner's father to come up to the railing and whispered to them that their son "took a plea." When she asked about the details of the plea, counsel whispered, "25 years and two ten's[.]" She said that this was the only information that trial counsel gave her about the plea at the time. She also said that she believed her son had formally taken the plea during the meeting in chambers. She acknowledged that the offer accepted by her son contained the same sentence lengths as the offer that the Petitioner had quickly rejected the previous week.

After trial counsel told her that her son had accepted the offer from the State, Broyles met with her son in the conference room. Broyles said she cried and hugged her son. She also said her son did not say anything about the plea or what had happened. She did not recall trial counsel saying anything while she was in the conference room.

One week after the Petitioner entered his plea, Broyles met with trial counsel to get an explanation of what had happened in her son's case. Trial counsel told her, "[W]e can appeal it[,]" and she agreed that an appeal was necessary because she and her son did not agree with the plea. Broyles said that her son first told her that he did not agree with the plea the Saturday after he entered his guilty plea.

On cross-examination, Broyles admitted that trial counsel informed her that her son's earliest parole eligibility on the life sentence was fifty-one years, that her son was facing a total of fifty-six years on all of the other charges, and that the court could order these sentences to be served consecutively for an effective sentence of one hundred and seven years.

Broyles said that she was aware of the surviving victim's testimony regarding the incident and that she had read the statements given by the victims. She was also aware that her son admitted to shooting the victims. However, Broyles said that her son "was a 15-year old kid told what to do." She stated that she never asked her son if he wanted to accept the plea agreement and that her son never told her this was what he wanted to do. She could not remember if her son acknowledged the plea at all while she was with him.

The Petitioner, age nineteen, testified that he was fourteen years old at the time of the shooting incident at Campbell County High School. The Petitioner said that prior to the shooting incident, he had never made any important decisions. He said he had never needed a lawyer prior to this incident and had never watched a trial.

The Petitioner stated that his parents hired trial counsel shortly after he was arrested. After one or two other meetings, trial counsel visited him at the Knox County Detention Center and informed him that the State had made him an offer of "20 years, with a 15-year sentence for manslaughter and two 10-year sentences for aggravated assault" with parole eligibility after "eight years" contingent on his waiving his transfer hearing. The Petitioner said that both of his parents were present when trial counsel discussed the offer with him and that they met for more than an hour. At the end of the meeting, the Petitioner accepted the offer. He waived his transfer hearing and was sent to Mountain View Development Center.

The Petitioner said that approximately six months to one year after the offer was made his mother informed him that the State had rescinded the initial offer. His mother told him that the State had withdrawn the offer because the deceased victim's family did not agree to it.

The Petitioner then met with trial counsel, who also informed him that the State's offer had been withdrawn and that they would return to juvenile court. After the transfer hearing, his case was transferred to criminal court.

The Petitioner stated that trial counsel met with him shortly before trial to discuss a second offer from the State. His mother and father were visiting him at Mountain View Development Center when trial counsel showed up unexpectedly with the State's second offer, which was "25 years at a hundred percent and two ten-year sentences at 30 percent" for an effective sentence of forty-five years. Everyone discussed whether it was in his best interest to accept the offer, and he ultimately rejected the offer because he "didn't think it was in [his] best interest[,]" given that he believed he could get less time if he proceeded to trial.

The Petitioner said that on the day of trial he was sitting at the counsel table with trial counsel and Dr. McCoy. Jury selection had begun, and most of the jurors stated that they had heard about his case. At the time, the Petitioner said he felt "[n]ervous, ashamed, uncomfortable . . . ." By noon, the jury had been selected, and the trial court took a lunch recess. The Petitioner believed that the trial would begin after the lunch break. Trial counsel did not meet with him during lunch, and he ate in the holding tank in the jail. Following lunch, he was returned to the courtroom. Then trial counsel leaned over to him and whispered, "[W]e've got one last . . . agreement," consisting of "45 years with 25 at a hundred [percent] and the two ten's at 20 [percent]." The Petitioner said, "I'll do it[.]" The Petitioner said that he agreed to the offer without asking trial counsel a single question and that counsel did not talk to him privately about this offer. The Petitioner stated that even though his parents were sitting behind him, trial counsel did not motion for them to move forward so that he could explain the offer to them.

The Petitioner stated that at the time he accepted the plea he was "nervous, scared." He added, "[T]hat's the most pressure I've ever had on me at one time in my life. I didn't know what to do. I was thinking I didn't have any other way out." As soon as he told trial counsel that he was going to accept the offer, the attorneys and the trial court went into chambers. He said that trial counsel did not say anything else to him before going into the court's chambers. He also said trial counsel never asked him to come to a private room so that they could discuss the offer and never asked him to get his parents' approval before going into chambers. After some time, the Petitioner and the victims and the deceased victim's family were asked to go into chambers. He said he could tell that the victims "were reasonably upset and angry" and that "[t]hey wanted to see what was gonna [sic] be done." At the time, he felt "[h]orrible" and "[a]s nervous as you can imagine" because he was put in the room with the victims. He said that trial counsel never informed him as to what was going to happen in chambers. Then the victims discussed whether they thought the plea agreement was reasonable. The Petitioner said that no one asked him what he thought about the offer and that no one talked to him. Eventually, the victims and the prosecutor "came to the conclusion that they would let [him] take the plea."

The Petitioner said he was taken into a conference room with trial counsel while the district attorney was drafting the plea agreement. He remembered the district attorney bringing the plea agreement into the conference room and handing it to him. He said that trial counsel did not explain the constitutional rights he was waiving or the consequences of his guilty pleas and did not read the plea form to him. The Petitioner said he signed the form without reading it, although he acknowledged that trial counsel told him to read the plea agreement. The Petitioner said he believed that the plea agreement was finalized when he signed his name to the plea form and that no one informed him that the plea agreement was not final until he formally entered his plea in front of the trial court.

-8-

The Petitioner said that he was unable to meet with his parents until after he signed the plea agreement. His mother was "crying, sad" during the meeting in the conference room. When asked if he told his mother that he wanted to accept the offer, he responded, "Not to the best of my knowledge." After the emotional meeting with his mother, he went in front of the trial court and answered questions affirmatively. The Petitioner said that trial counsel advised him that the trial court was going to ask him numerous questions and that he needed to "just answer them yes[,]" which he did. Other than trial counsel whispering the offer to him, the Petitioner did not recall spending any time alone with trial counsel prior to signing the plea agreement. The Petitioner stated, "I felt pressured into [accepting the offer] because I was so nervous and scared, I didn't . . . know any other thing to do. I put my trust in my lawyer, [and] he let me down."

On cross-examination, the Petitioner acknowledged that the March offer required him to serve two more years than the offer he accepted at trial. When asked if he believed that two years was an insignificant amount of time, the Petitioner responded, "Definite[ly]." He acknowledged that if he had been convicted of first degree murder, he would have been eligible for parole in fifty-one years. However, he said that under the plea agreement that he accepted, he would be eligible for parole in twenty-nine years. When asked if the parole eligibility reduction from thirty to twenty percent made a difference to him, he stated, "[Trial counsel] could have c[o]me to me with the 30 percent at that point in time, and I'd have probably [taken] it, too." When the prosecutor asked if the Petitioner was worried that he would receive a life sentence at trial, he responded, "I just wanted . . . my trial to be over then because I was so nervous." When asked if he understood that he might be convicted of first degree murder at trial, the Petitioner said, "I'm willing to take my chances at trial." The Petitioner, although admitting that the possibility of being convicted of first degree murder at trial made him nervous, said he accepted the plea because trial counsel told him there was not another option. The Petitioner asserted that trial counsel told him, "[T]his is the last deal right here[,]" and "[Y]ou'll be lucky to get it." The Petitioner then said, "I'll take it." He admitted that no one forced him to enter his guilty plea. In explaining why he wanted to withdraw his guilty plea, the Petitioner stated, "Once I realized what I had fully got myself into, I didn't want to do it."

Following the Petitioner's testimony, the Petitioner's counsel sought to admit the affidavit of Dr. James Murray, a forensic psychologist, which had been attached to the post-conviction petition. In the affidavit, Dr. Murray stated that he had reviewed many of the Petitioner's medical and psychiatric records as well as the psychological evaluations conducted by Dr. Diana McCoy and Dr. Vance Sherwood in an effort to determine whether the Petitioner was competent to plead guilty. Dr. Murray opined that the Petitioner's extreme clinical and developmental impairments when combined with his age and "the method and manner in which the plea was communicated, i.e.[,] suddenly during the course of a first

-9-

degree homicide trial, raise[d] serious issues regarding whether his decision to dramatically accept a plea agreement during the course of a trial with only a few hours' consideration, was knowingly, intelligently[,] and voluntarily entered into [sic]." The post-conviction court admitted the affidavit over the State's objection.

The State then renewed its motion to dismiss the post-conviction petition on the basis that the grounds asserted in the petition had been previously determined by the trial court and the Tennessee Court of Criminal Appeals. The Petitioner's attorney responded that ineffective assistance of counsel had not been raised in the previous proceeding and that different testimony had been presented in the post-conviction hearing. Specifically, he argued that the attorney who represented the Petitioner on the motion to withdraw his guilty plea had not raised any issues regarding trial counsel's ineffective assistance. The post-conviction court denied the State's renewed motion to dismiss the petition.

Trial counsel testified that he represented the Petitioner at the transfer hearing and during the plea negotiations in this case. He disclosed what he had told the Petitioner about his charges:

I told him that he was charged with murder, felony murder, that there were lesser included offenses–second degree murder, manslaughter, criminally negligent homicide or involuntary manslaughter, whichever, assault, two, I think, aggravated assaults, lesser included offenses of those. That's what I remember.

He said that the Petitioner appeared to understand what trial counsel told him about his charges. When he met with the Petitioner at the Knox County Detention Center, he said the Petitioner "understood the charges and the lesser included offenses."

Trial counsel said that he had been practicing law for thirty-four years and that "seventy to eighty percent" of his practice was criminal defense. He said that he had represented a lot of individuals who had been charged with crimes, including first degree murder and felony murder. Trial counsel said that he had the Petitioner's family hire Dr. Diana McCoy, a psychologist, for the purpose of examining the possibility of an insanity defense or diminished capacity, to help the Petitioner understand the charges against him, and to gather facts and interview witnesses regarding the case.

Trial counsel stated that the district attorney informed him that he would accept an offer of fifteen years, with a parole eligibility of seven or eight years, prior to the Petitioner's transfer hearing. The district attorney's acceptance of this offer was conditioned on the Petitioner waiving his transfer hearing and on the approval of the victims and the deceased

victim's widow. The Petitioner subsequently waived his transfer hearing and made the State that offer. However, before the plea agreement was finalized, the Petitioner was interviewed by Dr. Vance Sherwood, a clinical psychologist for the State. After that interview, the district attorney said that he could no longer accept the offer of fifteen years. Trial counsel stated that the district attorney later made an offer of twenty-five years, with a parole eligibility of eighty-five percent, and two ten-year sentences with a parole eligibility of thirty percent, which the Petitioner rejected.

Trial counsel said that by noon at the trial on April 10, 2007, twelve or thirteen jurors had been tentatively accepted by both sides. The morning of the trial, the prosecutor had communicated an offer to the Petitioner, which was the same offer that the Petitioner and his parents had rejected approximately one week prior to trial. Voir dire for the jury began at 9:15 or 9:30 a.m and sometime around 10:30 or 11:00 a.m., the prosecutor made another offer, which was a twenty-five-year sentence with a parole eligibility of one hundred percent for second degree murder, and two ten-year sentences with a parole eligibility of twenty percent. He said that the offer at trial differed from the offer rejected one week earlier only in that the Petitioner was treated as a mitigated offender with a parole eligibility of twenty percent rather than thirty percent. Trial counsel communicated this offer to the Petitioner at the defense table, and the Petitioner said, "Take it." Then trial counsel and the Petitioner retired to the conference room where trial counsel explained the offer to him: "I told him the State's offer, I told him the 20 percent. I recall [the Petitioner] not being too happy at [the] 20 percent, but [he] understood and he took the offer." He added, "At some point, [the Petitioner's] mother was back [t]here with us." Trial counsel said he heard a discussion between the Petitioner and his mother in which she said that "it was best [that] he take [the offer.]" Then the Petitioner said "it was in his best interest that he take it." Trial counsel said that the Petitioner's mother was upset at the time and that the Petitioner "was upset[,]" but he was "clearer than she was." Trial counsel said that the Petitioner's father was not present in the conference room during this discussion.

Trial counsel said that he did not recall making a recommendation to the Petitioner about taking the offer that he ultimately accepted. He said, "I rarely recommend that a defendant take a plea. It's ultimately up to the defendant to accept or reject a plea. I simply communicate the plea and make sure that they understand what they are doing." He said that he was satisfied that the Petitioner understood what he was doing by accepting the plea.

When asked if trial counsel believed that the plea was in the Petitioner's best interests at the time, he stated:

> It–yes, it–it was because of the parole eligibility. If he had gone to trial,
> if he were convicted of what he was charged with, he wouldn't have been

eligible to make application for parole for 51 years. That's a long time. Twenty-three years is a long time, but 23 is less than 51 before he's eligible for parole.

Trial counsel said that he believed that the Petitioner was at risk of being convicted of first degree murder at trial. However, he said he had a reasonable chance of convincing the jury that the Petitioner should be convicted of a lesser included offense.

Trial counsel stated that he was present when the Petitioner signed the plea agreement. When asked if he reviewed the plea agreement with the Petitioner, trial counsel stated:

I went over it generally. I outlined . . . everything that [the Petitioner] was waiving in this. I then gave it to him to read. He read it, and I gave him the opportunity to ask me questions. I don't recall if he asked questions or if he didn't ask questions. He signed it. I can't say that I read [the plea agreement] word for word to [the Petitioner].

Trial counsel could not recall whether the Petitioner's mother was in the conference room before or after the Petitioner signed the plea agreement. He also could not recall whether the Petitioner's mother made any comments about the plea agreement.

On cross-examination, trial counsel admitted that the only other minor he had represented who was charged with first degree murder was a sixteen-year-old in Union County, Tennessee, who entered a guilty plea. He also admitted that the Petitioner's case was one of the largest criminal cases in Campbell County and that it was important that the Petitioner understood what was happening in his case.

Regarding the fifteen-year offer, trial counsel said that it was important to involve the Petitioner's parents and that he talked with them about the offer around the same time that he discussed it with the Petitioner. He was unsure whether the Petitioner's parents were present when he discussed the fifteen-year offer with the Petitioner. He said that he involved the Petitioner's parents because of the Petitioner's age and because Dr. McCoy, the psychologist, indicated that the Petitioner had some impairments.

Trial counsel said that when the fifteen-year offer became an impossibility, he notified the Petitioner and his parents. However, trial counsel admitted that he involved the Petitioners' parents less in the case following the transfer hearing. Shortly before trial, trial counsel conveyed a second offer to the Petitioner. He recalled that he unexpectedly saw the Petitioner's parents at Mountain View Development Center when he arrived to inform the

-12-

Petitioner of the offer. At the end of that meeting, the Petitioner rejected the offer.

Trial counsel said that the morning of trial, the district attorney approached him with another offer, which he rejected without presenting it to the Petitioner or the Petitioner's family, and jury selection began. He said that the trial court gave everyone a lunch break, and when he returned from lunch, the district attorney tendered the offer that the Petitioner accepted, which closely resembled the offer he had rejected just a few days before. Trial counsel acknowledged that the courtroom was filled with people, television cameras, print media, and jurors. He admitted that he whispered the offer to the Petitioner at the counsel table and did not mention the offer to the Petitioner's parents. Trial counsel said that the Petitioner "gave an immediate response" accepting the offer within "[t]hree seconds." Trial counsel acknowledged that the Petitioner's parents did not know that the Petitioner had just accepted the offer and that he did not notify the parents of the Petitioner's acceptance of the offer until a later point in time. Trial counsel informed the district attorney that the Petitioner had accepted the offer, and the attorneys asked the court for permission to settle the case.

Trial counsel said he and the district attorney went into chambers to inform the trial court of the offer while the Petitioner remained in the crowded courtroom. At some point, trial counsel went with the Petitioner into the conference room as the plea agreement was being drafted. Trial counsel acknowledged that he did not involve the Petitioner's parents in the discussion regarding the plea agreement. He also admitted that the Petitioner was not very happy after accepting the offer. Trial counsel acknowledged that the Petitioner's unhappiness after accepting the offer was "[m]aybe" a red flag.

Trial counsel admitted that the Petitioner had committed a serious offense and had a history of drug and alcohol abuse at an early age. He also admitted that the Petitioner was a quiet child with a history of emotional and mental problems, which had been confirmed by Dr. Ericson, social worker Camille Heatherly, Peninsula Hospital, Ridgeview Mental Health Center, and Grainger Family Care. He further acknowledged that the staff at Ridgeview had determined that the Petitioner had poor judgment, poor concentration, and poor insight and that the Petitioner was impulsive. Trial counsel admitted that "[t]hree seconds" was not long enough for the Petitioner to consider and accept a plea agreement.

On redirect examination, trial counsel said that he communicated the offer to the Petitioner at the counsel table as well as in the conference room at length. In addition, trial counsel said that he "generally prepared" the Petitioner for trial and that he discussed with the Petitioner whether he would testify.

In its written order granting post-conviction relief, the court, noting this court's previous refusal to allow the Petitioner to withdraw his plea, held that the issue of the

voluntariness of the Petitioner's plea had not been addressed within the context of ineffective assistance of trial counsel. The court summarized the procedural history of this case and summarized the facts that were offered for the first time at the post-conviction hearing. One of these facts was the affidavit of Dr. James F. Murray, a forensic psychologist. The court noted the following statement included in Dr. Murray's affidavit:

> [M]any youth–more often than adults–manifest deficits in abilities related to trial participation that are similar to those of adults who are found incompetent to stand trial due to mental disorders. These "youth" deficits, however, were not related to mental disorders but to the fact that they were operating with cognitive and psychological abilities that were still developing.

The court stated, "Dr. Murray further opines that the issue of time (the nature and impact of sentencing) is a particularly demanding cognitive and emotional task for adolescents" and that "[a]dolescents tend to value a decision that ends an unpleasant present-term, but relatively short last event, in exchange for another event adolescents see occurring in the future but not immediately impinging on them." The court continued, "Dr. Murray opined the Petitioner's mental condition raises serious issues about his decision to accept the plea in this case." The court determined that "Dr. Murray's findings are significant to this Court because they are consistent with other psychological assessments in this case which touch on functional impairments of the Petitioner." It also said that although trial counsel had the Petitioner's parents hire Dr. Diana McCoy, a psychologist, to evaluate the Petitioner, to help him understand the proceedings related to his case, and to interview witnesses, trial counsel failed to ask Dr. McCoy "to counsel or assist the Petitioner in evaluating his understanding of the consequences of his plea." However, the court said, "Dr. McCoy's lack of participation in the plea is only a marginal issue in the Court's assessment."

The court also stated that it learned for the first time at the post-conviction hearing that "three (3) seconds elapsed from the time [trial counsel] whispered to the Petitioner that a new offer was conveyed and Petitioner's acceptance." The court noted:

> The difference in the offer made prior to trial and the Noon offer was a reduction of the ten-year sentence [from a thirty percent release eligibility] to a 20% [release eligibility]. This was explained to Petitioner before the three-second lapse of time. Other than that discussion, the Record does not indicate any other conversations with the Petitioner before the in camera conference, and the Record is devoid of any conversation with the parents prior to the in camera discussion. In fact, Petitioner's mother testified she did not know what was occurring while in Chambers and that her son was taken to the conference room. When Petitioner was escorted into Chambers, [she] testified she still did

-14-

not know what was occurring. She testified that when Petitioner left Chambers and went to the conference room, she was told that Petitioner had taken a plea. The mother was allowed to enter the conference room, but stayed only briefly. She hugged her son and they were emotional. Petitioner's mother left without being told the specifics of the plea. These are significant facts because at all stages of the previous plea bargaining process, both parents were closely involved with their son and [trial counsel]. The Record reveals that the parents of the Petitioner thoroughly discussed the terms of the offers prior to the final plea agreement subject to this order. All parties accepted the fifteen-year sentence, but totally rejected the subsequent offers.

Further, [trial counsel] testified that the decision to plead was made solely by the Petitioner. [Trial counsel's] practice is not to advise a client to either accept or reject a plea, but allow the client to make that decision. There is no issue with this policy, but it reinforces the Court's conclusion that the decision to enter a plea was a split[-]second decision made by a fifteen-year-old. The conversation that occurred between the Petitioner and [trial counsel] in the conference room concerning the plea is meager. The Record does not contain the specifics or the details that were discussed between Petitioner and counsel other than Counsel's recollection; that he explained the plea and that Petitioner understood the terms. It should be pointed out that the eventual plea entered only changed the total effect of Petitioner's [release] eligibility [for parole] by two years. Instead of 27 to 28 years to serve before parole eligibility, the accepted plea reduced the term to 25 years. This is not a significant reduction and has puzzled the Court for several years: why such a small reduction would motivate the Petitioner to accept this offer. This small reduction would seem to suggest that Petitioner had little to lose with an eventual trial.

Although the Petitioner is of average intelligence as revealed in the numerous psychological reports filed in this case, he has experienced some functional disabilities. This Court previously found that the Petitioner had experienced a lengthy transfer hearing and was familiar with Court proceedings. [Trial counsel] is a competent attorney with thirty years of experience. However, at the time this plea was proposed, the Record is silent as to any advice given by [trial counsel] about the charges and the penalty to be imposed. As he testified, [trial counsel] stated that there was another offer, a last offer, and Petitioner took it in three seconds. Petitioner testified that he took it because he was scared and wanted to get it over.

At the previous hearing on the Motion to Withdraw [the Guilty Plea], this Court concluded that Petitioner knowingly, voluntarily, and intelligently entered his plea. Having reviewed the additional facts presented at [the post-conviction] hearing, this Court finds the contrary. The Court finds that the Petitioner entered this plea to avoid a greater penalty [that he faced at trial] but with a desire to "get it over." The Court finds that Petitioner's plea was not intelligent in light of all the circumstances which include his age, functional impairment, the excitement and tension of the trial and lack of any involvement with his parents to any extent in those discussions. Consequently, the Court finds that the plea was not knowing, intelligent or voluntary under these circumstances.

The post-conviction court also found that trial counsel had provided ineffective assistance to the Petitioner:

This finding [that the Petitioner's plea was not knowing, intelligent, or voluntary] brings the Court to the issue of whether [trial] counsel was ineffective in not [ensuring] that Petitioner's plea met the appropriate standards. Counsel is a very skilled and accomplished attorney. However, the Court finds that counsel's performance was deficient in those proceedings. [Trial counsel] knew and understood that his client was 14 years of age when this crime occurred. His awareness of his client's mental status was such that he employed Dr. McCoy to assist him in assuring the Petitioner understood the proceedings. More significantly, [trial counsel] was aware that Petitioner's parents played a major part in the decision making process during the plea negotiations. [The parents] were present during the discussions of the 15-year proposal. They discussed the second proposal and rejected that proposal in a belief that the Petitioner would receive a lesser sentence at trial. The initial proposal at the start of the day of trial was similarly rejected. However, after the last offer was extended, the parents were not consulted by counsel, nor was Petitioner given the opportunity to discuss the matter with his parents. Even when the mother briefly entered the conference room, she was told only that her son had accepted the plea, but not its terms. She did not have an opportunity to consult with her son regarding the consequences of his plea.

Considering all these circumstances, the Court finds by clear and convincing evidence that counsel's performance was deficient in: failing to involve the parents in the last plea agreement; not informing the Court that the acceptance by Petitioner was a split[-]second decision; not discussing fully with the Petitioner the ramification of his plea before the in camera

-16-

proceeding; and, not providing Petitioner with meaningful advice about the insignificant reduction of two years in the offer.

The Petitioner's testimony reveals that he would not have taken the plea absent the circumstances outlined above. Therefore, the Court finds the evidence is clear and convincing that the results would have been different absent counsel's error. The prejudice prong of Strickland has been established. See Strickland v. Washington, 466 U.S. 668, 694 (1984).

## ANALYSIS

**I. Affidavit of Dr. James Murray.** The State argues that the trial court erred in admitting, over its objection, the affidavit of Dr. James Murray, a forensic psychologist, because it was inadmissible pursuant to the Post-Conviction Procedures Act, the Rules of Post-Conviction Procedure, and the Rules of Evidence. Specifically, the State argues that the Petitioner, in stating only that the affidavit was "reliable," failed to provide an exception to the hearsay rule and failed to cite to any other authority that would allow for the admission of the affidavit. It asserts that given the trial court's error in admitting the affidavit, this court is precluded from considering it on appeal. In response, the Petitioner contends that because the affidavit was submitted at the same time and in support of the post-conviction petition, it is a part of the record. In addition, the Petitioner argues that the affidavit is not hearsay and that the State has waived the hearsay issue because it failed to object to the affidavit as hearsay at the post-conviction hearing. We agree with the State that the trial court erred in admitting Dr. Murray's affidavit.

Here, after the Petitioner testified at the post-conviction hearing, the Petitioner's attorney stated that he wished to admit the affidavit of Dr. Murray, "which [was] a part of the record." The State objected, arguing that the affidavit was not a part of the record, and Petitioner's counsel stated that the affidavit was attached to its petition as Exhibit M. The State objected to the affidavit's admission on the ground that it was not in evidence, even though the affidavit had been attached to the post-conviction petition. The Petitioner's counsel responded that sworn affidavits were "clearly reliable" and that the State had not objected to the affidavit's attachment to the post-conviction petition. The post-conviction court stated, "I'll let it in."

We initially note that "[a]ffidavits, records or other evidence available to the petitioner supporting the allegations of the [post-conviction] petition may be attached to it." T.C.A. § 40-30-104(e). Although Dr. Murray's affidavit properly supported the allegations in the post-conviction petition, the trial court erred in admitting it as evidence in the post-conviction

hearing. It is well-established that affidavits are generally inadmissible at evidentiary hearings:

> "An affidavit is ordinarily not admissible to prove facts in issue at an evidentiary hearing, because it is not subject to cross examination and would improperly shift the burden of proof to the adverse party. . . . Affidavits are generally not competent evidence unless provided by statute. . . . As a general rule, a party is not permitted to create an issue of fact by submitting a[n] affidavit whose conclusions contradict a prior deposition or other sworn testimony."

State v. Amy Jo Blankenship, No. M2002-01878-CCA-R3-CD, 2004 WL 508500, at *4 (Tenn. Crim. App. Mar. 16, 2004) (quoting 3 Am. Jur. 2d Affidavits § 19 (2002)) (concluding that the appellant's affidavit, which alleged that the public defender's office had coerced her into pleading guilty, failed to fulfill her burden of establishing why her guilty pleas should be withdrawn pursuant to Tennessee Rule of Criminal Procedure 32(f)); State v. Ricky Brandon and Jimmy W. Brandon, No. M2002-00073-CCA-R3-CD, 2002 WL 31373470, at *3 (Tenn. Crim. App. Oct. 15, 2002) (concluding that the appellants' affidavits, which alleged facts supporting their ineffective assistance of counsel claims, failed to fulfill their burden of proving the factual allegations in the petition for post-conviction relief by clear and convincing evidence). Furthermore, "affidavits are incapable of credibility assessment, which is oftentimes pivotal in determining ineffective assistance of counsel claims." Amy Jo Blankenship, 2004 WL 508500, at *4; Ricky Brandon, 2002 WL 31373470, at *3. Therefore, we will not consider the information contained in Dr. Murray's affidavit in determining whether the Petitioner was entitled to post-conviction relief.

**II. Ineffective Assistance of Counsel and Voluntariness of Guilty Plea.** The State argues that the Petitioner failed to establish that trial counsel provided ineffective assistance of counsel. In addition, it contends that the Petitioner is entitled to no relief on his claim that his guilty plea was not knowingly, voluntarily, and intelligently entered. The Petitioner asserts that the post-conviction court properly granted relief on these grounds.

Post-conviction relief is only warranted when a petitioner establishes that his or her conviction is void or voidable because of an abridgement of a constitutional right. T.C.A. § 40-30-103 (2012). The Tennessee Supreme Court has held:

> A post-conviction court's findings of fact are conclusive on appeal unless the evidence preponderates otherwise. When reviewing factual issues, the appellate court will not re-weigh or re-evaluate the evidence; moreover, factual questions involving the credibility of witnesses or the weight of their

testimony are matters for the trial court to resolve. The appellate court's review of a legal issue, or of a mixed question of law or fact such as a claim of ineffective assistance of counsel, is de novo with no presumption of correctness.

Vaughn v. State, 202 S.W.3d 106, 115 (Tenn. 2006) (internal quotation and citations omitted). "The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence." Id. (citing T.C.A. § 40-30-110(f); Wiley v. State, 183 S.W.3d 317, 325 (Tenn. 2006)). Evidence is considered clear and convincing when there is no serious or substantial doubt about the accuracy of the conclusions drawn from it. Hicks v. State, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998) (citing Hodges v. S.C. Toof & Co., 833 S.W.2d 896, 901 n.3 (Tenn. 1992)).

**A. Ineffective Assistance of Counsel.** The State argues that the Petitioner failed to establish that trial counsel's performance was deficient or prejudicial. Specifically, the State contends that the record does not support the post-conviction court's determinations that trial counsel rendered deficient performance in "failing to involve the parents in the last plea agreement; not informing the Court that the acceptance by Petitioner was a split[-]second decision; not discussing fully with the Petitioner the ramifications of his plea before the in camera proceeding; and not providing the Petitioner with meaningful advice about the insignificant reduction of two years in the final offer."

In response, the Petitioner contends that he established by clear and convincing evidence "that trial counsel was ineffective in the manner and method in which he communicated the final plea offer and advised, or failed to advise, [the Petitioner] and his family regarding the plea." He also argues that trial counsel was ineffective because he knew of the Petitioner's history of "mental and emotional problems" and failed to involve the Petitioner's parents prior to the Petitioner's entering his guilty plea at trial. Moreover, he argues that trial counsel was aware that the Petitioner and his parents made the decision to reject an almost identical offer from the State just prior to trial. The Petitioner claims the record established that if he had been given a "meaningful opportunity" to discuss the plea agreement with his parents, there is a substantial likelihood that he would have rejected the plea agreement." The record supports the post-conviction court's determination that trial counsel provided ineffective assistance to the Petitioner in this case.

Vaughn repeats well-settled principles applicable to claims of ineffective assistance of counsel:

> The right of a person accused of a crime to representation by counsel
> is guaranteed by both the Sixth Amendment to the United States Constitution

and article I, section 9, of the Tennessee Constitution. Both the United States Supreme Court and this Court have recognized that this right to representation encompasses the right to reasonably effective assistance, that is, within the range of competence demanded of attorneys in criminal cases.

202 S.W.3d at 116 (internal quotations and citations omitted).

In order to prevail on an ineffective assistance of counsel claim, the petitioner must establish that (1) his lawyer's performance was deficient and (2) the deficient performance prejudiced the defense. Id. (citing Strickland v. Washington, 466 U.S. 668, 687 (1984); Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)). "[A] failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Indeed, a court need not address the components in any particular order or even address both if the [petitioner] makes an insufficient showing of one component." Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996) (citing Strickland, 466 U.S. at 697).

A petitioner successfully demonstrates deficient performance when the clear and convincing evidence proves that his attorney's conduct fell below "an objective standard of reasonableness under prevailing professional norms." Id. at 369 (citing Strickland, 466 U.S. at 688; Baxter, 523 S.W.2d at 936). The appropriate standard is "whether the advice given, or the services rendered by the attorney, are within the range of competence demanded of attorneys in criminal cases." Baxter, 523 S.W.2d at 936. Prejudice arising therefrom is demonstrated once the petitioner establishes "'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" Goad, 938 S.W.2d at 370 (quoting Strickland, 466 U.S. at 694). In order to satisfy the "prejudice" requirement in the context of a guilty plea, a petitioner "must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." Hill v. Lockhart, 474 U.S. 52, 59 (1985); see Serrano v. State, 133 S.W.3d 599, 605 (Tenn. 2004). In other words, the "prejudice" requirement "focuses on whether counsel's constitutionally ineffective performance affected the outcome of the plea process." Hill, 474 U.S. at 59.

Broyles, the Petitioner's mother, testified that she and the Petitioner's father were involved in the Petitioner's decision to accept the offer of fifteen years and to reject the offer of forty-five years, which were received prior to trial. She stated that she was unaware that the State had made an offer to her son during trial and was never informed as to the reason for the meetings in chambers. After her son returned from the meeting in chambers, trial counsel told her only that her son "took a plea" and that the plea agreement was for "25 years and two ten's." Broyles said she was under the mistaken impression that her son had entered

his plea during the meeting in chambers. She also stated that trial counsel never said anything to her about the plea when she met with her son in the conference room. A week after her son entered his plea, Broyles met with trial counsel and informed him that an appeal was necessary because neither she nor her son agreed with the plea.

The Petitioner testified that most of the jurors who were selected stated that they had heard about his case and that he felt "[n]ervous, ashamed, uncomfortable . . . ." When trial counsel told him in open court that they had received one last offer from the State of twenty-five years at one hundred percent and two ten-year sentences at twenty percent, the Petitioner immediately said, "I'll do it," without asking counsel any questions about the offer. The Petitioner said that trial counsel never spoke privately with him to explain the offer and never informed his parents, who were sitting behind him, of the offer prior to him going into the meeting in chambers. The Petitioner said that he felt "[h]orrible" and "[a]s nervous as you can imagine" during the meeting in chambers because he was put in the room with the victims and was never informed as to what was going to happen. He stated that trial counsel never explained the constitutional rights he was waiving or the consequences of his guilty pleas. He also stated that trial counsel did not read the plea agreement to him. The Petitioner said he believed his plea was finalized when he signed his name to the plea agreement and that trial counsel never informed him that the agreement was not finalized until he formally entered his plea in front of the trial court. He also said he was unable to meet with his parents until after he signed the plea agreement. The Petitioner asserted that the two-year reduction in the offer he accepted was insignificant and that he probably would have accepted the prior offer with a release eligibility of thirty percent given his mental state at trial.

Lastly, trial counsel testified that he asked the Petitioner's family to hire Dr. Diana McCoy, a psychologist, to help the Petitioner understand his charges and to gather facts and interview witnesses in the case. He acknowledged that the Petitioner had a history of emotional and mental problems as well as drug and alcohol problems at an early age. He also acknowledged that medical records revealed that the Petitioner had poor judgment and insight and that the Petitioner was known to be impulsive. Although trial counsel admitted that it was important to involve the Petitioner's parents in the offers received from the State because of the Petitioner's age and his mental problems, he admitted, without explanation, that he involved the parents less in the Petitioner's case after the Petitioner's transfer hearing. Trial counsel stated that he whispered the offer received at trial to the Petitioner, who "gave an immediate response" accepting the offer within "[t]hree seconds." However, he admitted that he did not mention this offer to the Petitioner's parents and did not notify the Petitioner's parents of the Petitioner's acceptance of the offer until a later point in time. Trial counsel acknowledged that he did not involve the Petitioner's parents in the discussion regarding the

plea agreement. He also acknowledged that he did not know whether the Petitioner's mother came into the conference room before or after the Petitioner signed the plea agreement.

Here, the post-conviction court held that trial counsel was deficient in failing to involve the Petitioner's parents in considering the offer, failing to inform the court that the Petitioner's decision to accept the offer was a split-second decision, failing to discuss with the Petitioner the consequences of the plea before the in camera proceeding, and failing to provide meaningful advice of the insignificant reduction of two years in the last offer from the State. After reviewing the record, we conclude that trial counsel was deficient in failing to involve the Petitioner's parents and Dr. McCoy in the decision as to whether to accept the offer from the State received the day of trial. Trial counsel was aware of his client's age, his client's mental and emotional problems, and his client's tendency to be impulsive. He also had convinced the Petitioner's parents to hire Dr. McCoy, a psychologist, to assist the Petitioner in understanding his charges. Trial counsel admitted that he had discussed the two prior offers with the Petitioner's parents. Despite this, trial counsel failed to involve, most importantly, the Petitioner's parents and, to a lesser degree, Dr. McCoy, given her prior involvement, in the Petitioner's decision regarding the offer, and we conclude that this critical error constituted deficient performance. Moreover, we agree with the post-conviction court's finding that but for trial counsel's deficiency in failing to involve the Petitioner's parents and Dr. McCoy in his decision regarding the plea, the Petitioner would not have pleaded guilty and would have proceeded to trial. Upon review, the record demonstrates by clear and convincing evidence that trial counsel's performance fell below the level of competence required in criminal cases. In addition, the record also demonstrates a reasonable probability of prejudice because, but for trial counsel's errors in failing to involve the Petitioner's parents and Dr. McCoy in the decision regarding the plea, the Petitioner would not have pleaded guilty and would have proceeded to trial.

**B. Voluntariness of Guilty Plea.** The State argues that the Petitioner is entitled to no relief on his claim that his guilty plea was not knowingly, voluntarily, and intelligently entered. First, the State contends that this court previously determined that the Petitioner's guilty plea was knowingly and voluntarily entered when the Petitioner appealed the denial of his motion to withdraw his guilty plea. See T.C.A. § 40-30-106(h) ("A ground for relief is previously determined if a court of competent jurisdiction has ruled on the merits after a full and fair hearing."); Kenneth S. Bartley, 2009 WL 1175148. Second, the State asserts that even if the Petitioner could relitigate this claim, he has failed to establish that his guilty plea was not knowing, voluntary, and intelligent. Finally, the State contends that there was no new evidence presented at the post-conviction hearing that undermined this court's prior decision affirming the denial of the motion to withdraw his guilty plea.

In response, the Petitioner argues that the trial court's finding that his plea "was not knowing, voluntary and intelligent was grounded in the court's holding that Mr. Bartley received ineffective assistance of counsel" and that these two issues were "necessarily and inextricably intertwined in evaluating Mr. Bartley's claims for post-conviction relief." Consequently, the Petitioner asserts that the issue of the voluntariness of his plea within the context of ineffective assistance of counsel had not been previously determined. The Petitioner also contends that he did not waive the issue that counsel's ineffective assistance rendered his plea unknowing and involuntary because there is no requirement that he raise this issue in his motion to withdraw his guilty plea or on direct appeal. See Kendricks v. State, 13 S.W.3d 401, 405 (Tenn. Crim. App. 1999) ("[B]ecause of the significant amount of development and factfinding" required for these claims, "we do not believe the Legislature intended the issue of ineffective assistance of appellate counsel to be waived if not raised on direct appeal."). Finally, despite the State's arguments to the contrary, the Petitioner argues that he presented new evidence regarding the voluntariness of his plea within the context of counsel's ineffective assistance at the post-conviction hearing, which focused "on the timing and sufficiency of [the Petitioner's] discussions with counsel regarding the ramifications of the plea." We conclude that because the Petitioner's issue regarding the voluntariness of the his plea was so interconnected with his claim of ineffective assistance, it was not previously determined or waived. Moreover, we conclude that the Petitioner presented new evidence, including his "split[-]second decision" to accept the offer at trial without the benefit of his parents, which related to the voluntariness of his plea within the context of the counsel's ineffective assistance.

When analyzing the validity of a guilty plea, we follow the federal landmark case of Boykin v. Alabama, 395 U.S. 238 (1969), and the Tennessee landmark case of State v. Mackey, 553 S.W.2d 337 (Tenn. 1977), superseded on other grounds by rule as stated in State v. Wilson, 31 S.W.3d 189, 193 (Tenn. 2000). State v. Pettus, 986 S.W.2d 540, 542 (Tenn. 1999). In Boykin, the United States Supreme Court held that a trial court may not accept a guilty plea unless there is an affirmative showing that the guilty plea was "intelligent and voluntary." 395 U.S. at 242. When accepting a guilty plea, the trial court is responsible for "canvassing the matter with the accused to make sure he has a full understanding of what the plea connotes and of its consequence." Id. at 244. In Mackey, the Tennessee Supreme Court held that "the record of acceptance of a defendant's plea of guilty must affirmatively demonstrate that his decision was both voluntary and knowledgeable, i.e., that he has been made aware of the significant consequences of such a plea; otherwise, it will not amount to an 'intentional abandonment of a known right.'" 553 S.W.2d at 340.

"[I]n evaluating the knowing and voluntary nature of a guilty plea, '[t]he standard was and remains whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant.'" Jaco v. State, 120 S.W.3d 828, 831

(Tenn. 2003) (quoting North Carolina v. Alford, 400 U.S. 25, 31 (1970)). The Tennessee Supreme Court has emphasized that a plea is not voluntary if it is the result of "'[i]gnorance, incomprehension, coercion, terror, inducements, [or] subtle or blatant threats . . . .'" Blankenship v. State, 858 S.W.2d 897, 904 (Tenn. 1993) (quoting Boykin, 395 U.S. at 242-43). A trial court must look at a number of circumstantial factors before determining whether a guilty plea is voluntary and intelligently made. Id. These factors include the following:

> the relative intelligence of the defendant; the degree of his familiarity with criminal proceedings; whether he was represented by competent counsel and had the opportunity to confer with counsel about the options available to him; the extent of advice from counsel and the court concerning the charges against him; and the reasons for his decision to plead guilty, including a desire to avoid a greater penalty that might result from a jury trial.

Id. (citing Caudill v. Jago, 747 F.2d 1046, 1052 (6th Cir. 1984)).

Broyles testified that the day of the Petitioner's trial the courtroom was "packed" with people, cameras, and reporters and that every juror had heard about her son's case. She stated that although she and the Petitioner's father were involved in the Petitioner's decision to accept the offer of fifteen years and to reject the offer of forty-five years that were received prior to trial, she was unaware that the State had made an offer to her son during trial and was never informed as to the reason for the meetings in chambers. Only after her son returned from the meeting in chambers was she told by trial counsel that her son "took a plea" and that the plea agreement was for "25 years and two ten's." She also said that trial counsel never said anything to her about the plea when she met with her son in the conference room after the meeting in chambers. A week after her son entered his plea, Broyles met with trial counsel and informed him that an appeal was necessary because neither she nor her son agreed with the plea. She opined that her son accepted the offer at trial because he "was a 15-year old kid told what to do."

The Petitioner testified that prior to the shooting incident, he had never had to make any important decisions, had never needed an attorney, and had never watched a trial. He confirmed his mother's testimony that most of the jurors had heard about his case. He stated that at trial he felt "[n]ervous, ashamed, uncomfortable . . . ." He also stated, "[T]hat's the most pressure I've ever had on me at one time in my life. I didn't know what to do. I was thinking I didn't have any other way out." When trial counsel told him in open court that they had received one last offer from the State of twenty-five years at one hundred percent and two ten-year sentences at twenty percent, the Petitioner immediately said, "I'll do it." He stated that he never asked trial counsel any questions about the offer and that trial counsel never spoke privately with him to explain the offer. In addition, the Petitioner said trial

counsel never informed his parents, who were sitting behind him, of the offer prior to his having the meeting in chambers. The Petitioner stated that during the meeting in chambers, he felt "[h]orrible" and "[a]s nervous as you can imagine" because he was put in the room with the victims and was never informed as to what was going to happen. He stated that trial counsel never explained the constitutional rights he was waiving or the consequences of his guilty pleas. He also stated that trial counsel did not read the plea agreement to him. The Petitioner said he believed his plea was finalized when he signed his name to the plea agreement and that trial counsel never informed him that the agreement was not finalized until he formally entered his plea in front of the trial court. Moreover, he asserted that he was unable to meet with his parents until after he signed the plea agreement. The Petitioner said, "I felt pressured into [accepting the offer at trial] because I was so nervous and scared, I didn't . . . know any other thing to do. I put my trust in my lawyer, [and] he let me down." He also added, "I just wanted . . . my trial to be over because I was so nervous." The Petitioner said that the two-year reduction in the offer he accepted was insignificant and that he probably would have accepted the prior offer with a release eligibility of thirty percent given his mental state at the trial. He said he accepted the offer at trial because trial counsel had told him there was not any other option, that this was the "last deal," and that he would be "lucky to get it." Regarding his desire to withdraw his guilty plea, the Petitioner said, "Once I realized what I had fully got[ten] myself into, I didn't want to do it."

Finally, trial counsel testified that he asked the Petitioner's family to hire Dr. Diana McCoy, a psychologist, to help the Petitioner understand his charges and to gather facts and interview witnesses in the case. He acknowledged that the Petitioner had a history of emotional and mental problems and drug and alcohol problems at an early age. He also acknowledged that medical treatment revealed that the Petitioner had poor judgment and insight and was known to be impulsive. Trial counsel acknowledged that the Petitioner's case was one of the largest criminal cases in Campbell County and that it was vital that the Petitioner understand what was happening in his case. He confirmed that the courtroom the day of the Petitioner's trial was filled with people, television cameras, print media, and jurors. Although trial counsel admitted that it was important to involve the Petitioner's parents in the offers received from the State because of the Petitioner's age and his mental problems, he admitted, without explanation, that he involved the parents less in the Petitioner's case after the transfer hearing. Trial counsel stated that he whispered the offer received at trial to the Petitioner, who "gave an immediate response" accepting the offer within "[t]hree seconds." Regarding his explanation of the offer with the Petitioner, trial counsel stated, "I told him the State's offer, I told him the 20 percent. I recall [the Petitioner] not being too happy at [the] 20 percent, but [he] understood and he took the offer." He also said that he "generally" reviewed the plea agreement with the Petitioner and stated, "I can't say that I read the [plea agreement] word for word to [the Petitioner]." Significantly, trial counsel was unable to recall whether the Petitioner's mother was in the conference room

before or after the Petitioner signed the plea agreement. Trial counsel admitted that he did not immediately inform the Petitioner's parents of receipt of the offer, that he did not involve the Petitioner's parents in the discussion regarding the offer, and that he did not immediately inform the Petitioner's parents of the Petitioner's quick acceptance of the offer. He acknowledged that the Petitioner's unhappiness about the offer was "maybe" a red flag.

Here, the post-conviction court held that the Petitioner's plea was not knowing, intelligent, and voluntary given the Petitioner's age and functional impairments, the excitement and tension of the trial, and the lack of any parental involvement in his decision to accept the offer. However, we conclude that the Petitioner's plea was not knowing, intelligent, and voluntary because of trial counsel's ineffective assistance. Although the Petitioner was of average intelligence, the evidence at the post-conviction hearing showed that the Petitioner had a history of emotional and mental problems as well as drug and alcohol problems at an early age. In addition, the proof showed that the Petitioner had poor judgment, poor insight, and was known to be impulsive. It is undisputed that the Petitioner, who was fourteen when he committed the offense, and fifteen at the time of his trial, had no familiarity with criminal proceedings. As we previously stated, trial counsel was aware of the Petitioner's age, unfamiliarity with criminal proceedings, mental and emotional problems, and tendency to act impulsively. The evidence showed that although trial counsel informed the Petitioner of the offer, he failed to inform the Petitioner's parents of the offer and failed to involve the Petitioner's parents and Dr. McCoy in a full discussion of the consequences of the plea prior to the Petitioner entering his guilty plea. In addition, the evidence showed that trial counsel provided limited advice to the Petitioner prior to the Petitioner's acceptance of the offer. Based on this evidence, we conclude that the Petitioner entered his guilty plea without the benefit of his parents' and Dr. McCoy's involvement, which prevented him from receiving a careful, thorough evaluation of the details of the offer and the consequences of his plea. The record demonstrates by clear and convincing evidence that the Petitioner's guilty plea was not knowingly, voluntarily, and intelligently entered because of the ineffective assistance rendered by trial counsel.

## CONCLUSION

Upon review, we affirm the judgment of the post-conviction court.

_____
CAMILLE R. McMULLEN, JUDGE